Not for Publication                                    Not for Publication

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No.  08-36335-DOT |
| | ) | |
| BEVERLY MCNAMARA LIPOSKY, | ) | CHAPTER 7 |
| Debtor. | ) | |
| ——————————————————) | ) | |
| | ) | |
| BEVERLY MCNAMARA LIPOSKY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 09-03076-DOT |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| EDUCATION; | ) | |
| EDUCATION CREDIT MANAGEMENT | ) | |
| CORPORATION, | ) | |
| Defendants. | ) | |
| ——————————————————) | ) | |

## MEMORANDUM OPINION (UNPUBLISHED)

Trial was held November 12, 2009, on debtor plaintiff's complaint seeking to discharge education loan debt pursuant to 11 U.S.C. § 523(a)(8). This code section provides that education loan debt cannot be discharged in bankruptcy unless the court finds that requiring debtor to repay the debt would constitute an undue hardship on the debtor or her dependents. At the conclusion of trial, the court reserved ruling and requested counsel for the parties to submit proposed findings of fact and conclusions of law, which have now been received.

For reasons stated in this opinion, the court finds that debtor has failed to present sufficient evidence to sustain her burden of proof that repayment of the loans would constitute an undue hardship. Therefore, judgment will be entered for the defendants and the complaint dismissed.

**Findings of Fact.**

Debtor filed this individual chapter 7 case on December 11, 2008. She  is 65 years of age

and resides with her non-debtor husband of 18 years in Spotsylvania County, Virginia. She has

one dependent, a granddaughter, of whom she has legal custody. The granddaughter, who has

not resided in the debtor's home since July 2009, will turn 18 in June 2010 and at that time is

expected to graduate from high school.

Debtor received a B.S. degree in accounting in 1993 and a law degree from Seton Hall

University in 1996. She obtained the student loans at issue in this case for the purpose of

financing the law school education. Debtor has engaged in the private practice of law in

Spotsylvania County since 1999.

Mr. Liposky, age 65, has a bachelor's degree in accounting. He is a career employee of

the federal government, and he has held his current position with the U.S. Federal Aviation

Agency for about 17 years.

FAMILY INCOME

The debtor realized net business income from her law practice as follows:

| | |
|---|---|
| 2001 | $39,934.00 |
| 2002 | $27,391.00 |
| 2003 | $23,095.00 |
| 2004 | $34,164.00 |
| 2005 | $42,134.00 |
| 2006 | $43,849.00 |
| 2007 | $27,867.00 |
| 2008 | $37,579.00 |

(Pl. Ex. 2.)

Mr. Liposky's salary in 2009 was $136,395.00, and his net take-home pay on a monthly

2

basis was $4,993.00. (Pl. Ex. 1, 4.)

Debtor and her husband file joint federal income tax returns. Their total household income for calendar year 2008 was $169,349.00.[1]

DEBTOR'S EDUCATION LOANS

To provide for payment of expenses of her law school education, debtor in May 1996 obtained two consolidation loans from American Education Services (AES) (a private loan and a federally guaranteed loan) and a direct loan from the U.S. Department of Education. She also obtained a plus loan from Direct Loans for her son. All of these loans are education loans subject to the provisions of 11 U.S.C. § 523(a)(8). AES assigned its loans to defendant to Education Credit Management Corporation. (ECMC Ex. B.)

Beginning in 1997 debtor made repayments toward the AES loans over a period of years in the total amount of approximately $55,000.00 to $60,000.00. She repaid one of the AES loans in full. From May 2006 to October 2008, debtor made total payments on the Department of Education loans in the amount of $26,400.24. (Pl. Ex. 6.)

The balance owed by debtor on the Department of Education loans on March 31, 2009, was $68,576.93. (Dept. Ed. Ans. ¶ 6.) The balance on the AES loan on June 10, 2009, was $79,761.83. (ECMC Ex. C.)[2] These loans remain outstanding.

Pre-petition, debtor requested deferments on the Direct Loans and requested an income

---

[1] This income placed the Liposkys in the top 12.6 percent of income earners in Spotsylvania County, Virginia, as estimated by the American Community Survey, U.S. Census Bureau. (Def. Exs. 103, 116.)

[2] Debtor's complaint, paragraph 6, alleges that there is also due approximately $5,900.00 on her son's loan. It is not clear in the record whether this balance is included in the $68,576.93 loan balance acknowledged by the Department of Education.

sensitive payment plan. A forbearance was granted, which will end in 2010. The income

sensitive plan was not accepted by debtor because the minimum interest only payment would

have been essentially the same as the present loan payment.

DEBTOR'S HEALTH

The following facts were obtained from the deposition of Dr. Susan Lacks, M.D., a

doctor of internal medicine specializing in rheumatology, who has been treating debtor since

1997.

While debtor has other health issues, her main problem, for which she has been treated by

Dr. Lacks, is a severe skin disorder called "dermatomyositis, a condition in autoimmune disease

where people can get inflammation in their skin and their muscles." Her condition is called

"amyopathic" dermatomyositis, meaning that the disease is in her skin and not her muscles.[3] As

a result of this disease debtor has a rash that primarily affects her scalp, face, shoulders and

upper chest. (p. 13.) In "an autoimmune disease, the immune system turns against the body and

starts to cause damage, rather than being a protector." Debtor's immune system causes

"inflammation in her skin, and itching." (p. 14.)

Another manifestation of debtor's disease is fatigue, which is caused by several factors,

including a lack of sleep. (p. 15.) Her sleep is disrupted by severe itching in her scalp and by the

drugs she must take in the treatment of her disease. Debtor has gained weight and suffered from

severe headaches. She became diabetic as a result of her treatment and feels fatigue due to

changing levels of  blood sugar. (pp. 16-17.) The itching in her scalp causes debtor to scratch the

affected area, and this causes bleeding and results in lesions, or scabs. A number of medications

---

[3] Dr. Lacks stated that dermatomyositis is more serious when it affects the muscles. She has not diagnosed debtor as having the condition in her muscles. (p. 13.)

4

have been prescribed in debtor's treatment. Of all the prescribed drugs, the only one that has

helped debtor consistently is prednisone, a drug having many side effects, including sleep

interference. (pp. 19-20.) At times Dr. Lacks has attempted to have debtor taper off her use of

prednisone; however, this has caused debtor to "just suddenly feel completely exhausted." When

this happens the dose of prednisone must be boosted. (pp. 22-23.) Cognitive problems are

another side effect of debtor's medications, "problems with memory, and focus, and

concentration . . . and people cannot be as alert as . . . we would like them." (p. 31.)

Debtor's dermatomyositis is incurable. While the disease may be controlled in some

cases, it has not been controlled for debtor, who has a "difficult" case of the disease. Debtor has

seen other specialists at Johns Hopkins, and her physicians have been "very frustrated" over their

inability to control debtor's disease. (p. 35.) Dr. Lacks does not believe debtor capable of

working more than 20 hours per week, and she would prefer that debtor not work at all. (pp. 45-

46.) She does not believe debtor "is capable of [practicing law] on a full-time basis, or with the

full cognitive function that one would hope an attorney brings to their practice." (p. 71.)

Additional findings of fact are stated below.

## Discussion and Conclusions of Law.

Student loans are generally non-dischargeable.  However, the exception to this rule

allows student loans to be discharged when forcing repayment would impose an undue hardship

on the debtor and the debtor's dependents.[4] 11 U.S.C. § 523(a)(8).

---

[4] (a)        A discharge under section 727 . . . of this title does not discharge an individual
debtor from any debt –

* * * *

(8)        for an educational . . . loan made, insured or guaranteed by a

UNDUE HARDSHIP

The burden of proving undue hardship is on the debtor. *Wilson v. Educ. Credit Mgmt. Corp. (In re Wilson)*, 2002 WL 32155401 at *2 (Bankr. E.D. Va. 2002) (citing *United States v. Wood*, 925 F.2d 1580, 1583 (7th Cir. 1991)). Congress did not define "undue hardship" in the Bankruptcy Code, and therefore it is incumbent upon the courts to supply a meaning to the term. *See Kapinos v. Graduate Loan Ctr. (In re Kapinos)*, 243 B.R. 271, 274 (W.D. Va. 2000). The courts have provided a stringent test for undue hardship.

The majority of courts deciding the issue have relied on the test set out by the Court of Appeals for the Second Circuit in *Brunner v. N.Y. State Higher Education Services Corp. (In re Brunner), 831 F. 2d 395, 396 (2d Cir. 1987)*. The Fourth Circuit Court of Appeals adopted the *Brunner* test in *Ekenasi v. Education Resources Institute (In re Ekenasi)*, 325 F.3d 541, 546 (4th Cir. 2003). *See also Spence v. Educ. Credit Mgmt. Corp.(In re Spence)*, 541 F.3d 538 (4th Cir. 2008), *cert. denied*, 129 S. Ct. 1319 (2009); *Educ. Credit Mgmt. Corp. v. Mosko, (In re Mosko)*, 515 F.3d 319 (4th Cir. 2008).  The *Brunner* undue hardship test requires the debtor to show that:

> 1) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
>
> 2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
>
> 3) that the debtor has made good faith efforts to repay the loans.

*In re Brunner,* 831 F.2d at 396.

---

> governmental unit . . . , unless excepting such debt from discharge under this paragraph will impose an *undue hardship* on the debtor and the debtor's dependents . . . .

11 U.S.C. § 523 (emphasis added).

6

APPLYING *BRUNNER* TEST TO DEBTOR LIPOSKY

1. Can Debtor Maintain a Minimal Standard of Living and Pay the Loans?

A minimal standard of living does not require a debtor to live in poverty, but it does require her to reduce her expenses to an amount that is minimally necessary to meet her basic needs.  *Perkins v. Penn. Higher Educ. Assistance Agency (In re Perkins)*, 318 B.R. 300, 305 (Bankr. M.D.N.C. 2004).  *See Murphy v. Sallie Mae (In re Murphy)*, 305 B.R. 780, 793 (Bankr. E.D. Va. 2004) ("[T]he bankruptcy court must determine what amount is minimally necessary to ensure that the debtor's needs for care, including food, shelter, clothing and medical treatment are met."). In determining whether debtor's expenses of living preclude the repayment of educational loan debt, it is often said there must be a "certainty of hopelessness" that the debtor cannot pay the debt. *Gill v. Nelnet Loan Svcs., Inc. (In re Gill), 326 B.R. 611, 625* (Bankr. E.D. Va. 2005).  "In order to discharge a student loan, a debtor must show that unique or extraordinary circumstances which created the hardship render it unlikely that the debtor will ever be able to honor her obligations." *Id.* (citing *Love v. U.S. ( In re Love)*, 33 B.R. 753, 754-55 (Bankr. E.D. Va. 1983)).

Courts in the Fourth Circuit "generally do not find an inability to maintain a minimal standard of living where a debtor shows a surplus of income over expenses." *Burton v. Educ. Credit Mgmt. Corp. (In re Burton*), 339 B.R. 856, 871 (Bankr. E.D. Va. 2006). Family income is the measure of the income calculation. *In re Gill*, 326 B.R. at 626; *Virginia State Educ. Assistance Auth. v. Dillon*, 189 B.R. 382, 385 (W.D. Va. 1995); *see Shaw v. U.S. Dept. of Educ.*, 2003 WL 24108195, n.2 (Bankr. E.D. Va.2003) ("Though Mrs. Shaw is unemployed and has no income, Mr. Shaw's income must be considered in determining whether Mrs. Shaw has

7

sufficient income to maintain a minimal standard of living.").

The court finds that debtor has failed to carry her burden of showing that she cannot maintain a minimal standard of living if required to repay the loans. Her household income is in the top 12.6 percent of incomes for where she lives. The following analysis of her family monthly income and expenses reveals that debtor has a current ability to make payments toward her student loans and still maintain a minimal standard of living.

*Income From Debtor's Law Practice*

According to debtor's testimony, she is concerned that her health problems will reduce her income from law practice in 2009 and later years. She closed her former law office in 2009 and moved the practice to her home, while renting a small office for space to meet with clients. She has thus curtailed her operating expenses. She has also curtailed the types of cases she will take; for example, she will no longer take contested divorces. She expects to represent children and adults under disability as guardian *ad litem* and to take other court-appointed cases.

Debtor testified that she anticipates her future current monthly gross receipts from law practice will average $4,000.00 and that her monthly law office expenses will average $1,753.00, leaving an average monthly net income of $2,247.00.  In her brief, she argues that her future net monthly income will average approximately $1,239.00. Debtor testified that her gross receipts for November 2009 were $5,000.00. There is no supporting documentation for any of these figures.

The debtor and her husband testified that she has worked just part time since around 2005 (approximately 30 hours per week in 2008). Based on the Liposkys' income tax returns for the years 2005-2008, debtor's average professional income for these years was $30,286.00. This

8

represents average monthly net income of $2,524.00, which is reasonably close to debtor's estimates in her testimony. Debtor's estimates appear to be based upon her working about 20 hours per week, which her physician testified she was capable of.

Based on this analysis, the court finds that for the immediate future debtor will have net law practice income in the average monthly amount of at least $2,300.00. This amount must be reduced by federal, state, and self-employment taxes totaling $1,008.00. (Pl. Ex. 1.) Her approximate net monthly income from law practice will be $1,292.00.

*Income of Joseph Liposky*

Mr. Liposky is 65 years of age and employed as a systems accountant for the Federal Aviation Administration with an annual salary of $136,395.00. His monthly average net take-home pay is $4,993.00.

For purposes of the § 523(a)(8) undue hardship analysis, Mr. Liposksy's income must be adjusted, that is increased by current deductions from his gross wages that are not necessary for the Liposkys' minimal standard of living allowed them under the Code. Thus the following deductions must be added back to his monthly take-home income: 1) $989.19 payment on Thrift Savings Plan (TSP) loan that will be fully repaid in August 2010, 2) $459.33 voluntary TSP catch-up payment, and 3) $1,354.16 voluntary contribution to TSP. (Pl. Exs. 1, 4.)[5] Thus the undue hardship analysis requires an adjustment to increase Mr. Liposky's current monthly

---

[5] The Thrift Savings Plan allows federal employees to contribute up to specified amounts of funds from their salaries on a tax deferred basis for the purpose of augmenting retirement pensions. The TSP catch-up is a method for employees to contribute for prior years in which they did not make the maximum allowed payment. For income tax purposes, the TSP is similar to an Individual Retirement Account (IRA). Upon retirement, an employee has the option to withdraw funds from the TSP account on a taxable basis. As with an IRA, an employee must begin to withdraw from the TSP at age seventy and one-half or risk paying a significant penalty.

income as follows:

```
$4,993.00 (current monthly take-home pay)
   989.19 (TSP loan repayment; loan repaid in August 2010)
   459.33 (TSP catch-up)
 1,354.16 (TSP contribution)
$7,795.68 (monthly take-home pay, adjusted for undue hardship analysis)
```

*Liposky Family Living Expenses*

Plaintiff's Exhibit 1 lists monthly family living expenses in the amount of $7,238.00, and

repayment of Mr. Liposky's personal debt in the amount of $2,200.00.

The undue hardship analysis requires the court to reduce the living expenses in several

respects to reflect the minimal standard of living that must be projected. The children's expenses

of $1,100.00 for debtor's granddaughter will not be payable after June 2010 when the child reach

the age of 18. Cable TV expense of $94.00 is not justified. The amounts claimed for gifts

(church/charity, Christmas/ birthdays), entertainment, pet expenses, and vacations, total of

$575.00, are excessive in the undue hardship analysis and should be reduced by at least one half.

This results in a reduction of $287.50. Another item that may not be considered is a $404.00 per

month car payment for debtor's adult son. The following schedule reflects the adjusted living

expenses that are permitted.

```
$7,238.00 (Total expenses, Pl. Ex. 1)
 (1,100.00)
  ( 94.00)
  (287.50)
  (404.00)
$5,352.50 (permitted expenses)
```

*Monthly Net Income Surplus*

The court's income and expense analysis reveals an adjusted current monthly net income

surplus for the Liposkys in the amount of $1,535.00 derived from their combined income of

$9,088.00 ($1,292.00 plus $7,796.00) less expenses and debt repayment in the total amount of $7,553.00 ($5,353.00 plus $2,200.00).

No adjustment has been made to Mr. Liposky's monthly debt repayments, and the reduced budget is not overly restrictive. Even so, debtor has not proven she meets the first *Brunner* test, an inability to meet a minimal standard of living. The Liposkys have higher than average income and simply have sufficient income at the present time to enable them to cut back on their lifestyle and make payments on debtor's education loan debt. Moreover, their ability to pay has been amply demonstrated by their lifestyle and financial history since 1997.

2. Are there Additional Circumstances Indicating Debtor's Continuing Ability to Maintain a Minimal Standard of Living?

The debtor cannot meet the first *Brunner* test because she does have a present ability to maintain an adequate standard of living and make education loan payments. Therefore the court approaches the second *Brunner* test from a different direction, examining whether the evidence supports a limitation on the time that debtor can maintain that adequate standard of living. Consideration of this factor is included in the final section of this opinion

3. Has Debtor Made Good Faith Efforts to Repay Her Education Loans?

As found by the court, debtor has made substantial payments on her education debt since 1997. It appears that much of Mr. Liposky's current debt derives from his efforts to pay debtor's loans. They stopped making the loan payments about the time debtor filed this bankruptcy case. Mr. Liposky testified the payments were stopped because they could no longer afford them. Debtor requested a deferment of payment and also sought an income sensitive plan.

Payment on education loan debt is usually regarded as evidence of a debtor's good faith.

11

However, defendants argue that good faith is not proven in this case because the Liposkys have not made sufficient efforts to temper their lifestyle by maximizing their income and minimizing their living expenses. In support of this argument, defendants point to the expenditures that the court has previously noted in adjusting the permitted living expenses. Another such expenditure is a $375.00 monthly car payment toward debtor's purchase of a 2009 Toyota Camry following her discharge in bankruptcy. The evidence developed by defendants at trial suggests that debtor's previous Camry was a good and reliable car that did not need replacing.

The court agrees with defendants that the Liposkys have not always made stringent efforts to minimize their living standard since debtor filed bankruptcy. Nevertheless, in light of the substantial payments they have made on debtor's education debt since 1997, including the amount of debt Mr. Liposky has incurred for this purpose, the court finds that on balance debtor has met the *Brunner* good faith test. Under the circumstances of this case, however, the good faith test is a neutral factor.

SUMMARY

The debtor does not meet the standard of the first *Brunner* test because she has the present ability, based upon her family income, to pay the education loans and maintain a minimum standard of living. However, in view of her age and health and the possibility that her future resources may decline, the court will consider whether debtor is eligible for a discharge of a portion of the loans.

PARTIAL DISCHARGE

The language of § 523(a)(8) does not explicitly authorize partial discharge of education debt, and some courts have held that an undue hardship discharge under § 523(a)(8) must be "all

or nothing." *See, e.g., United Student Aid Funds, Inc. v. Taylor (In re Taylor)*, 223 B.R. 747

(B.A.P. 9th Cir. 1998). However, the majority of courts now allow for partial discharge of

student loan debt where debtor can pay a portion but not all of the debt without suffering undue

hardship. *See 4 Collier on Bankruptcy ¶ 523.14[3]* (Alan N. Resnick & Henry J. Sommer, eds.

16th ed. rev. Dec. 2009); *Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168

(9th Cir. 2003) (holding that bankruptcy courts have the power to grant partial discharge of

student loans if the portion being discharged satisfies § 523(a)(8)); *Miller v. Penn. Higher Educ.*

*Assistance Agency (In re Miller),* 377 F. 3d 616 (6th Cir. 2004) (the debtor must demonstrate

undue hardship under § 523(a)(8) for the portion to be discharged); *Tenn. Student Assistance*

*Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433 (6th Cir. 1998); *Lohr v. Sallie Mae (In re Lohr)*,

252 B.R. 84, 89-90 (Bankr. E.D.Va. 2000). The Ninth Circuit found that the all or nothing

approach to § 523(a)(8) "contravenes Congress' intent in granting bankruptcy courts equitable

authority to enforce the provisions of the Bankruptcy Code." *In re Saxman*, 325 F.3d at 1174.

The U.S. District Court for the Western District of North Carolina examined the partial

discharge issue in *Educ. Credit Mgmt. Corp. v. Waterhouse (In re Waterhouse)*, 333 B.R. 103

(W.D.N.C. 2005). Recognizing that the Fourth Circuit Court of Appeals had not ruled on the

issue, the district court expressed the view that partial discharge of a student loan would require

any amount discharged to meet the § 523(a)(8) undue hardship test. *Id.* at 113-114.[6]

In summary, there is sufficient authority for the allowance of a partial discharge of

---

[6] There are two unpublished decisions of the Fourth Circuit that support a partial discharge.
*See Lokey v. U. S. Dept of Education (In re Lokey)*, 98 Fed. Appx. 938, 2004 WL 1066315 (4th
Cir. 2004) (court remanded case to bankruptcy court with instructions to determine what portion
of the debtor's education debt was dischargeable);  *Floyd v. Educ. Credit Mgmt. Corp.,* 54 Fed.
Appx. 124, 2002 WL 31839159 (4th Cir. 2002) (upholding, without discussion of the issue,
decision of bankruptcy court that allowed a partial discharge of education loan).

student loans provided the portion for which discharge is granted represents an undue hardship pursuant to § 523(a)(8). The issue the court must consider here is whether under the second *Brunner* test there are circumstances to support a finding, within the parameters of the Code, that debtor's ability to maintain a minimal standard of living will come to an end within the foreseeable future.

Debtor owes student loan debt to defendant Department of Education in the amount of at least $68,577.00 and to defendant Education Credit Management Corporation in the amount of at least $79,762.00 for a total of $148,339.00. The loan balances are actually higher than these amounts because of the continuing accrual of interest. At the present time debtor is able to pay approximately $1,500.00 per month toward the loans. However, in view of the substantial loan balances, the court is constrained to consider for how long loan payments may be reasonably expected.

Both Mr. and Mrs. Liposky are 65 years old, an age in the normal range of retirement. Mr. Liposky testified that he intends to retire in December 2010. In view of the strict requirements for an undue hardship determination, neither age nor prospect of retirement, standing alone, are considered "additional circumstances" indicating a limitation on a debtor's ability to maintain a "minimal standard of living" under the second *Brunner* test. *See In re Spence,* 541 F.3d at 544 (debtor's age is not a factor); *In re Waterhouse*, 333 B.R. at 112 (for a 51 year old debtor, neither age nor the prospect of reaching retirement age were considered additional circumstances); *Mandala v. Educ. Credit Mgmt. Corp. (In re Mandala)*, 310 B.R. 213, 222 (Bankr. D. Kan. 2004) (fact that repayment period would extend beyond debtor's retirement age, standing alone, did not "skew" *Brunner* test). The court must therefore consider whether

14

other circumstances in Mrs. Liposky's case will support a partial discharge of her student loans.

One important additional consideration is debtor's health. The deposition testimony of her physician, Dr. Susan Lacks, persuasively demonstrates that debtor's health is deteriorating to the extent that her ability to continue in law practice beyond the next few years is doubtful. Dr. Lacks stated that while debtor is able to work 20 hours per week, she would prefer that debtor not work at all; moreover, debtor does not have "the full cognitive function that one would hope an attorney brings to their practice." (Lacks Dep., 71.) Nevertheless, debtor has cut back on the legal services she will offer in the future, and it is plausible that she could continue to earn in the range of $1,000.00 to $1,200.00 net per month for some years to come. Moreover, when she retires, or even before retirement, debtor will be eligible to draw social security in a monthly amount that could well be in the same range as the net monthly income from her law practice. Accordingly, the court finds that debtor's health is not an "additional circumstance" limiting her ability maintain a minimal standard of living.

This leaves the income of Mr. Liposky, who testified that he intends to retire in December 2010. In *Waterhouse*, the district court ruled that the fact the education debt repayment period would extend beyond debtor's retirement age was not grounds for debtor to avoid repaying the education loan. *In re Waterhouse,* 333 B.R. at 112. The court has been unable to find a case stating the same outcome with respect to a non-debtor's spouse's retirement. However, Mr. Liposky is in apparent good health, and given the strict rulings of our court of appeals in undue hardship cases, the court must hold that Mr. Liposky's desired retirement has no impact on the previous determination that debtor has ability to continue a minimal standard of living and make education loan payments.

15

Even if Mr. Liposky's retirement were a circumstance to be considered, an analysis of his post-retirement income does not support a finding that the family standard of living would be reduced below the minimal necessary to establish undue hardship. Mr. Liposky acknowledged in his testimony that his monthly take-home retirement annuity will be substantially the same as his current income, i.e., $4,993.00. Also, upon retirement he will be eligible to draw an additional annuity from his TSP account. Mr. Liposky's projected monthly TSP annuity at age 66 will be approximately $900.00. (ECMC Ex. 118.) Thus at retirement, he will receive a total annuity of approximately $5,893.00 per month  ($4,993.00 plus estimated TSP annuity of at least $900.00).[7] Assuming debtor's income from law practice remains in the $1,000.00 to $1,200.00 range, total family income would be approximately $7,093.00 monthly ($1,200.00 plus $5,893.00). Permitted monthly living expenses remain at $5,353.00. However, Mr. Liposky's monthly debt repayments, presently totaling $2,200.00, will be reduced as the debts are fully repaid.[8] Assuming Mr. Liposky retires in December 2010, in year four following retirement he should have paid all debt except for a $600.00 payment to FIA/SunTrust. Therefore, beginning in year five the Liposkys will have a monthly income surplus in the range of $1,143.00 ($7,185.00 less $5,353.00 plus $600.00).

---

[7] Plaintiff's counsel in his proposed findings of facts and conclusions of law states that Mr. Liposky's retirement take-home pay will be $4,466.00 plus TSP annuity of $989.00. He relies upon ECMC Exhibit K for the former figure. The court has relied on Mr. Liposky's testimony for the amount of payment. However, even accepting counsel's smaller amount would not change the court's ultimate conclusion. Mr. Liposky stated that he did not intend to take withdraw the TSP annuity until withdrawals are mandated when he reaches age seventy and one-half. However, for purposes of § 523(a)(8) the available annuity must be attributed to him upon retirement.

[8] Mr. Liposky testified that the debt listed in Plaintiff's Exhibit 1 would be repaid as follows: VISA, three years; Chase, five years; FIA/SunTrust, ten years; Macys, one year; IRS, two years.

The court recognizes the difficulty of predicting future budgets, and these figures, which are somewhat conjectural, should be viewed with caution. The point is, however, there is nothing in the trial record that persuades the court the Liposkys will reach a point in the foreseeable future when there will be a "certainty of hopelessness" that their resources will preclude them from making some payment on debtor's education debt. *In re Gill*, 326 B.R. at 625. For this reason, the court is unable to conclude that even a portion of debtor's education debt will qualify for an undue hardship discharge under § 523(a)(8).

A separate order will be entered.

DATED this 30th day of March, 2010.

BY THE COURT:

/s/ Douglas O. Tice Jr.
DOUGLAS O. TICE JR
Chief Judge
United States Bankruptcy Court

Entered on Docket:  March 30, 2010

Copies to:

Charles C. Cowsert, Esquire
4908 Hood Drive
Fredericksburg, Virginia 22408
*Counsel for Plaintif/Debtor*

Beverley Liposky
P.O. Box 366
Spotsylvania, Virginia 22553-0366
*Chapter 7 Debtor*

Robert P. McIntosh, Esquire
U.S. Attorney's Office
600 East Main Street, Suite 1800
Richmond, Virginia 23219

17

*Counsel for U.S. Department of Education*

Rand L. Gelber, Esquire
8000 Towers Crescent Dr., Suite 1350
Vienna, Virginia 22182
*Counsel for ECMC*

Bruce E. Robinson, Esquire
P.O. Box 538
South Hill, Virginia 23970-0538
*Chapter 7 Trustee*

Robert B. Van Arsdale, Esquire
Assistant United States Trustee
701 East Broad Street, Suite 4304
Richmond, Virginia 23219
*Office of the United States Trustee*